

FILED

MERLE and PAULA ABRAMS, et al, )
)
    Plaintiffs, )                           2004 JUL 15 P 2 50
)
v. )           **Case No. 3:03-CV-428**
)           Jury Demanded
FIRST TENNESSEE BANK )
NATIONAL ASSOCIATION, et al, )           BY
)
)
    Defendants. )

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Come the Plaintiffs, pursuant to the Court's Order dated June 28, 2004, allowing the

Plaintiffs to amend their complaint to state additional facts and allegations as to Covenant Title

and New South Federal Savings Bank, and amend their Complaint as follows:

1.       That paragraphs 100-123 be deleted and substituted in lieu thereof, the following:

### I. GENERAL STATEMENT OF FACTS

100.      All of the Plaintiffs herein purchased real property in Deer Path Resorts

           (hereinafter referred to as "Deer Path"), an overnight cabin rental development

           consisting of three resorts known as Douglas Lake Resort, which is located in

           both Jefferson County and Sevier County, Tennessee, and Lone Branch Creek

           Resort and Eagle Springs Resort, which are situated in Sevier County, Tennessee.

101.      Deer Path was marketed as a "Christian Resort" and the sales and promotional

           materials were aimed at ministers. Many of the Plaintiffs herein are either

           ministers or were referred to the project by ministers who had already purchased

           property in the development.

102.     The Plaintiffs herein were told prior to purchasing, both orally at sales presentations and in printed sales materials, that Daniel Stetson (hereinafter referred to as "Dan Stetson"), the principal owner of Deer Path Resorts, had been "called of God" to develop a plan that would benefit ministers and provide for their retirement and that Deer Path was the result of Dan Stetson's calling. The printed "Vision" statement of Deer Path states in part that "Deer Path Vacations will provide a resting place for Pastors, Evangelists, and Ministers who become 'weary in well doing' (Gal 6:9) and a Christian atmosphere where God's people can come to relax with family and friends, surrounded by the serenity and peace that comes from God (Heb 10:25)."

103.     The development plan purported to allow buyers to purchase a cabin for substantially less than the appraised value with little or no money to be paid by the buyer. The developer promised to lease the cabins back from the buyers and promised that the monthly lease payments would be enough to cover all out-of-pocket expenses, including the mortgage payments, utility payments, satellite TV payments, and the cost of upkeep and maintenance. Each of the buyers entered into a lease agreement with Deer Path. The buyers were told that by the end of the seven (7) year lease term, the overnight rental income would be sufficient to cover all related expenses and be enough to pay off the cabins within three (3) years of the end of the lease. The buyers were told that the development plan included having First Tennessee/First Horizon as the on-site source of financing and that based on the immediate equity in the property, the income from the lease, and the strength of the developer, virtually all who applied to purchase a cabin

would be approved for financing. First Tennessee and First Horizon, through their agent and on-site loan officer, J.W. Compton, at all times confirmed, validated, and recommended the plan of the developer and did in fact approve and finance the purchase of cabins in the development for virtually all who applied. Most prospective buyers visited the resort at the invitation of the developer, usually in connection with attending a minister's retreat or seminar, and were presented with the plan. The prospective buyers were then shown various styles of cabins and told the prices of each and were encouraged to buy a cabin. Most prospective buyers were then introduced to J.W. Compton with First Horizon and were shown into his office, which was located in the Deer Path sales offices. J.W. Compton participated with Deer Path and its affiliates in selling the real property and assisted the prospective purchasers in obtaining financing for their cabins, regardless of the style or price.

104.     J.W. Compton told the prospective buyers that First Tennessee and First Horizon had a special relationship with the developer and fully endorsed the developer's plan as a "can't lose deal." He also represented that the only thing the buyers were risking was the cabin itself. He assured them that none of their personal assets were at risk. J.W. Compton told the potential buyers that each could afford a cabin, regardless of income, because the mortgage payments would be paid from the lease payments they received from Deer Path. Deer Path representatives and J.W. Compton advised prospective buyers to execute Limited Powers of Attorney, naming Charles Gordon, III, a Deer Path employee, as their attorney-in-fact for the purpose of enabling Deer Path and J.W. Compton to complete all of

the necessary documentation required to purchase real property and to obtain financing for cabin construction. All of the Plaintiffs herein did in fact buy cabins under these facts and many of the Plaintiffs herein did execute the Limited Powers of Attorney.

105. J.W. Compton and Charles Gordon, III, the attorney-in-fact, proceeded to complete the purchase, arrange for the construction of a cabin, complete the loan application, obtain approval from First Horizon for permanent financing, arrange for the construction loan with First Tennessee, disburse the proceeds of the construction loan to the contractor, a company wholly owned and operated by the developer, conduct progress inspections, notify the buyer when construction on their cabin was complete, and finally arrange for closing on the permanent loan. In many cases, the buyers had no contact with Deer Path or First Tennessee from the time of the initial meeting in the sales office until they were notified that their cabin was complete and it was time to close their loans, often many months later.

106. First Horizon paid J.W. Compton a commission for each loan he procured for First Horizon. First Tennessee funded substantially all of the construction loans for cabins in each of the three developments of Deer Path. First Tennessee approved a total of approximately 250 construction loans in the Deer Path developments. First Horizon committed to provide substantially all permanent mortgage financing, which was to be used to pay off the construction loans made by First Tennessee. Through November of 2001, First Horizon provided the permanent financing for nearly every cabin completed prior thereto.

107.	In the fall of 2001, the First Horizon/Deer Path loans were the subject of an investigation by the Federal National Mortgage Association (FNMA) because all of the First Horizon/Deer Path loans had been underwritten as the buyers' second homes, not as overnight rental property in contravention of FNMA underwriting guidelines. As a result of the FNMA investigation, employees of First Tennessee and First Horizon conducted an internal investigation into the Deer Path project and found many irregularities. Substantially all First Tennessee customers had signed a form authorizing First Tennessee to deposit construction loan proceeds directly into the account of the contractor with the explicit understanding that the proceeds were only to be used for the construction of the cabins. However, Deer Path commingled construction loan proceeds with its general operation funds and made the lease payments to other cabin owners with the construction loan proceeds. Deer Path routinely mailed First Horizon single checks for large amounts with a list of mortgage payments that were to be paid. First Tennessee and First Horizon also discovered that Deer Path could not meet its obligations under the cabin owners' lease agreements and cover the cost of its operations without using money generated by the sale of lots and the construction of cabins. First Tennessee and First Horizon then realized that the financial condition of all cabin owners had been overstated and that the cabin owners were incapable of making their mortgage payments without the income to be received from the leases. First Tennessee and First Horizon also discovered that the Tennessee Environmental Protection Agency had notified Deer Path that the development at Eagle Springs violated certain regulations. They also discovered that Deer Path

was in danger of being shut down or incurring large costs and fines to bring the project into compliance with these environmental regulations. First Horizon learned that permanent financing had been closed on cabins that were not completed and could not be occupied. First Tennessee and First Horizon also discovered that Deer Path did not have the financial ability to complete the infrastructure and utilities for cabins for which permanent financing had already been closed.

108.   Upon information and belief, Blake Hauk, Director of Security for First Tennessee, conducted an internal investigation relating to Deer Path, the lending officer on-site, J.W. Compton, and J.W. Compton's supervisor, Terry Taylor. At the conclusion of Hauk's investigation, First Horizon terminated both J.W. Compton and Terry Taylor.

109.   With the knowledge gained from Hauk's investigation, First Tennessee and First Horizon made no more construction or permanent loans to cabin owners in the Deer Path project. First Horizon held approximately one hundred and forty-five (145) mortgages at this time that were all current and being paid in a timely manner by Deer Path pursuant to Deer Path's lease agreements with the cabin owners. J.W. Compton and other First Tennessee and First Horizon employees knew that these payments were being made from construction loan proceeds. First Tennessee, at this point in time, had approximately one hundred and twenty (120) outstanding construction loans in various stages of funding and no commitment for permanent financing from any lender other than First Horizon. After many meetings among First Tennessee employees, First Horizon

employees, lawyers for both banks, and the principals and owners of Deer Path, a criminal scheme was devised to conceal the insolvency of Deer Path and the fact that Deer Path was no longer an economically viable project.

110.    First Tennessee and First Horizon knew at the time of making the loans to the Plaintiffs and to the other cabin owners that none of the cabin owners were capable of making their mortgage payments or paying the other cabin-related expenses. First Tennessee and First Horizon made no attempt to contact any of the cabin owners, who were their customers, and advise them that Deer Path was insolvent and incapable of makings its contractual payments under the leases. First Horizon and First Tennessee actively concealed their discoveries from their customers, who currently owned and were in the process of building cabins in Deer Path. First Tennessee and First Horizon determined that it was imperative that Deer Path continue to make the mortgage payments to First Horizon so that the loans would remain current long enough for First Horizon to sell the loans to other lenders and for other lenders to make permanent loans for the cabins that were still under construction. For First Tennessee and First Horizon's scheme to work, it was also imperative that Deer Path actually complete the construction of those cabins for which they had already received funding. At the end of 2001, First Tennessee, First Horizon, and Deer Path reached an agreement to fund this scheme. First Tennessee agreed to loan Deer Path a sum in excess of three million dollars ($3,000,000.00) for the purposes described above. First Tennessee's employees oversaw all aspects of the Deer Path project, and all draws from the loan were conditioned upon the approval of First Tennessee

officers, including funds disbursed to Deer Path for the purpose of making the cabin owners' mortgage payments to First Horizon.

111.    Although J.W. Compton was terminated by First Horizon and/or First Tennessee, he stayed on-site at Deer Path in his same office, where he continued to work for the benefit of the criminal enterprise's participants.

111a.   Upon information and belief, J.W. Compton and Dan Stetson approached Mark Leho, the sole proprietor of Farragut Mortgage Group, in November or December of 2001. At this meeting, the parties discussed the Deer Path developments and the potential sale of a bundle of unrecorded Deer Path second mortgages at fifty percent (50%) of their face value, many of which had been executed by the developer via Limited Power of Attorney without the cabin owners' knowledge. As one of New South's leading correspondent brokers, Mark Leho approached New South about buying these second mortgages, but New South declined to purchase the mortgages. At this time, Mark Leho was fully aware of the title and financial problems at Deer Path. Despite this knowledge, Mark Leho agreed to purchase the second mortgages for fifty percent (50%) of their face value and paid Deer Path a sum in excess of five hundred thousand dollars ($500,000.00).

111b.   Leho's purchase of the second mortgages was part of the overall plan and scheme to keep Deer Path operating and the First Horizon mortgages current until First Tennessee could set up and fund a three million dollar ($3,000,000.00) line of credit for Dan Stetson and Deer Path. J.W. Compton and Dan Stetson also arranged for Mark Leho to provide the permanent financing for the approximately

one hundred twenty (120) cabins which had First Tennessee construction loans outstanding. From November of 2001 through August of 2002, J.W. Compton and Mark Leho closed approximately seventy (70) permanent loans for buyers in the Deer Path projects and paid off approximately seventy (70) of the one hundred twenty (120) outstanding First Tennessee construction loans.

111c.     J.W. Compton went to work for Mark Leho at Farragut Mortgage, where he arranged new permanent financing with New South Federal Savings Bank without the knowledge of the borrowers. Compton and Leho falsely informed the cabin owners that construction of the cabins was complete, that the sewer and water systems at the developments had been finished, and that the promised amenities and infrastructure development were on schedule. Although some cabins owners attended closings in J.W. Compton's on-site office, many cabins owners were not aware that New South Federal had replaced First Horizon as the permanent lender. The fees, expenses, and interest rates incurred by the cabin owners under the new permanent financing arrangement were substantially higher than what First Horizon had committed to at the initial approval. The cabin owners were told of the new terms at closing and were told by Leho, Compton, employees at Covenant Title, and employees at First Tennessee that they had no choice but to sign because their construction loans were due and closing was imperative. During this process, the interest rates on the loans increased dramatically. Mark Leho failed to disclose this increase in the interest rates as well as the actual amount of the effective interest rates. He also misrepresented certain terms in the closing statements, including the actual payoff amount owed to First Tennessee.

In several cases, less money was sent to First Tennessee than was withheld from the cabin owners' loan proceeds. On many occasions, Leho immediately refinanced the mortgages with New South bundled with the second mortgages he had previously bought from Stetson. Leho would then be paid 100% of the second mortgages' face value, realizing a large profit.

111d.     New South had actual knowledge of the problems in the Deer Path Development. Upon information and belief, Mark Leho told New South that First Tennessee and First Horizon had ceased doing business with Deer Path, effectively cutting off the cash flow to the developer. New South knew or should have known that J.W. Compton and his boss, Terry Taylor, had been fired by First Tennessee and that J.W. Compton had come under a FNMA investigation and an internal investigation for improperly classifying the Deer Path properties as second homes. Upon information and belief, New South was informed as to the structure and details of the operation, including the fact that the resort was being run as an overnight rental program while many of the cabins were classified as second homes. New South knew that the developer was making the mortgage payments on behalf of all cabin owners and that the cabin owners could not have qualified for financing without the income of the developer. New South knew that the income and asset figures in the loan applications had been altered. New South, through its agents at Farragut Mortgage, actively altered applications to qualify cabin owners. Furthermore, New South was aware that many of these loans were usurious and had been subject to excessively high closing fees charged by J. Mark Leho and J.W. Compton. New South obtained much of this knowledge

about Deer Path through its association with J. Mark Leho. Despite this knowledge, New South failed to disclose any of this information to the Plaintiffs, its clients. In holding back this knowledge, New South protected its interests in profiting from the closings with the cabin owners and did serious and irreparable damage to the Plaintiffs. If the Plaintiffs had been informed of the problems at Deer Path, then their damages would have been limited to the amount of the construction loans erroneously advanced to that date. Without this information, the Plaintiffs became obligated by the terms of their permanent financing arrangements and were charged excessive fees and often usurious interest rates. The Plaintiffs have all had their mortgages foreclosed by sale on the courthouse steps and their names published in the paper. They also face huge deficiency balances and irreparable damage to their credit.

112.    During this same time period, Deer Path submitted check requests to First Tennessee for its approval to pay vendors, conduct operations, make payroll, complete cabins, and make cabin owners' mortgage payments including payments to New South. The three million dollar ($3,000,000.00) line of credit was increased to four and a half million dollars ($4,500,000.00) by the end of June of 2002.

112a.   In early summer of 2002, First Tennessee recommended a consultant, Carl Norman, to Deer Path to help manage Deer Path operations. Carl Norman was introduced to Deer Path by Ron Willard, an employee of First Tennessee, and was placed in charge of all operations at Deer Path.

11

112b.    Deer Path had been designed and developed as a Planned Unit Development. A
preliminary plat outlining the overall planned development at each resort had
been submitted to the Sevier County Planning Commission and the Jefferson
County Planning Commission and had received preliminary approval prior to the
beginning of construction at Deer Path. Early in the development of the Deer
Path resorts, it was brought to the attention of the principals of Deer Path, First
Tennessee, and First Horizon, by and through J.W. Compton, that the construction
of the roads, the placement of the cabins on the lots, and the completion of the
infrastructure of the resorts was not being conducted pursuant to the plat that had
been submitted to the Sevier and Jefferson County Planning Commissions.
Landmark Title, the company who handled many of the initial closings between
July of 1999 and May of 2000, advised employees of Deer Path and J.W.
Compton repeatedly that there were significant lot line problems and problems
with the legal descriptions of the property being conveyed.

112c.    Heather Quinn-Bader, a title attorney working for Landmark Title, was fully
aware of the title problems and prepared correction quitclaim deeds for these
properties on a regular basis. The lot line problems were evident to Heather
Quinn-Bader because when each loan closed, Landmark Title had to obtain
correction quitclaim deeds from those individuals who ended up with parts of
other owners' lots to correct the plats. Heather Quinn-Bader finally created a
master correction quitclaim deed in an effort to offer Deer Path a solution to the
overlapping lot problems in the Douglas Lake Resort. The creation of this overall
correction deed came from a request made by J.W. Compton to Heather Quinn-

12

Bader's superior at Landmark Title, Judy Noles, to find a solution to the lot line problems in the Douglas Lake subdivision as a whole.

112d. Shortly thereafter, Deer Path stopped doing business with Landmark Title and began doing business exclusively with Covenant Title. In the middle of 2001, some six or seven months after Landmark ceased doing title work for Deer Path, Heather Quinn-Bader had a conversation with an abstractor at Covenant Title named Julie Carroll. The two discussed the rampant lot line problems at Douglas Lake. Julie Carroll indicated that Covenant Title was aware of these problems, and, according to Heather Quinn-Bader, the title problems would have been evident to anyone running a title search in Jefferson County or Sevier County. At all times relevant herein, Covenant Title knew of the lot line problems and continued insuring title as part of the Plaintiffs' closings from the beginning of 2001 through the summer of 2002. Covenant Title misrepresented to the cabin owners that their cabins were complete and the loans ready to be closed when in fact the cabins had not be completed according to specifications. Covenant Title profited from withholding this information from the Plaintiffs.

113. First Horizon, First Tennessee, and Covenant Title failed to disclose any of this to their customers, many of whom are Plaintiffs herein.

113a. In late spring or early summer of 2002, the Sevier County emergency management agency, in charge of plotting the exact locations and addresses of property for 911 emergency calls, discovered that significant lot line problems existed in the Deer Path developments. Further, it was discovered that many of the roads had grades so steep that emergency vehicles could not reach some of the

13

cabins. Upon receipt of the information, the Sevier County Planning
Commission halted further construction at the Deer Path projects.

114.    First Tennessee immediately declined any further draws on the line of credit and
        instructed Deer Path to discontinue making the cabin owners' mortgage
        payments. Thereafter, Deer Path did in fact stop making the mortgage payments
        due under the lease agreements beginning with the payments due on August 1,
        2002.

115.    Deer Path did not inform the Plaintiffs herein that mortgage payments had been
        discontinued until after all mortgages were nearly thirty (30) days late. Deer Path
        refused to turn over any of the overnight rental proceeds generated from renting
        the Plaintiffs' cabins and filed for Chapter Eleven (11) Bankruptcy protection in
        the fall of 2002. All of the lenders who held the mortgages of the cabin owners,
        including First Horizon, accelerated the notes and placed the owners in default.

116.    After Deer Path's bankruptcy action was filed, First Tennessee proposed to lend
        Deer Path an additional three and a half million dollars ($3,500,000.00) to
        complete construction of the cabins and infrastructure. Ultimately, Deer Path
        converted its bankruptcy to Chapter Seven (7) and no funds were advanced by
        First Tennessee.

117.    Deer Path ceased operations in December of 2002 and various lenders involved
        with the project have since instituted foreclosure proceedings against the cabin
        owners. As a result, the Plaintiffs herein are subject to having adverse credit
        reported and have been left with property valued at less than half of the amount of
        the liens on the property with no lease payments or overnight rental income to

14

assist them in making the payments. Furthermore, all of the Plaintiffs have either had their mortgages foreclosed or had foreclosure proceedings instituted or been advised that foreclosure is imminent, leaving them vulnerable to huge deficiency judgments.

118.    In order to provide additional capital for the Deer Path projects, Deer Path sold investments to cabin owners and others, some of whom are Plaintiffs herein. Investors were encouraged to roll over their existing individual retirement accounts (IRAs) to a company in Denver, Colorado known as Retirement Accounts, Inc.(hereinafter referred to as "RAI"), designating Deer Path as the intended investment and Dale Martin or Carl Ogle as the designee for the investment. In return, the investors were guaranteed a high percentage rate of return and were told that the investment would be secured by mortgages on property in the projects. The investment funds were transferred to RAI through a trustee to trustee transfer. The funds were received by RAI and immediately transferred to Deer Path. The investments were never secured by mortgages. J.W. Compton, the on-site loan officer of First Horizon, knew of the scheme to take investors' retirement accounts and knew that a portion of the funds appropriated through this scheme was being used to fund cabin owners' mortgage payments to First Horizon. Deer Path raised in excess of four million dollars ($4,000,000.00) through this scheme. The investment scheme further enabled Deer Path and J.W. Compton to sell more cabins and close more loans by showing prospective buyers that all current cabin owners' mortgage payments were being made out of the project.

15

119.    The surveyors, Ellison Surveying and Jim C. Ellison, prepared surveys for each parcel of real property showing the foot print of the cabin that was supposed to be constructed on each lot. The surveys were provided to First Tennessee as a means to verify that each cabin was located on the proper lot and that the placement of the cabin on the lot did not violate set back restrictions.

120.    The Plaintiffs aver that the surveys were not accurate, that the Defendants, Ellison Surveying and Jim C. Ellison, knew that the cabins were not constructed on the proper lots, and that, in spite of this knowledge, the Defendants provided surveys showing that the cabins were being constructed properly.

121.    The Plaintiffs aver that Defendants Ellison Surveying and Jim C. Ellison did not properly supervise the survey work and did not inspect the real property to insure that the surveys were correct. The Plaintiffs aver that Ellison put his stamp on surveys about which he had no personal knowledge.

122.    The appraisers, Milstead's Appraisal Service, Wes Milstead, Michael Snyder, Cole Appraisal Group, and Charles Cole, prepared appraisals that were provided to the lenders for the benefit of the Plaintiffs. The appraisals were made prior to construction of the cabins. The appraisals did not accurately reflect the true value of the cabins and real property. The appraisals contained false and misleading information. For example, some of the appraisals state that the sewer system is functional, when in fact, the sewer system at the Douglas Lake Resort is not and never has been functional. Also, some of the appraisals state that there are sufficient roadways at the Eagle Springs Resort which is not currently, nor ever

has been, true. At the request of the lenders, the appraisals were regularly
changed in order to affect the loan to value ratios.

123.     The Plaintiffs aver that the cabins would not have been constructed had the true
value of the cabins been disclosed in the appraisals. The Plaintiffs aver that the
appraisers did not make final inspections to insure that the cabins were
constructed as represented in the appraisals. The Plaintiffs aver that the
appraisers had a duty to inspect the cabins to insure that the cabins were complete
and built in accordance with the appraisals.

2.     That paragraphs 1131-1142 be deleted and substituted in lieu thereof, the following:

## Civil Rico Violations of 18 U.S.C. § 1961, *et. seq.* against Defendants First Tennessee, First Horizon, J.W. Compton, Dale Martin, Mark Stetson, Charles M. Gordon, III, J. Mark Leho d/b/a Farragut Mortgage Group, New South, Covenant Title/Covenant Title & Escrow, LLC

1131.     Plaintiffs reallege paragraphs 1 through 1124.

1132.     The Plaintiffs have standing to bring a civil action under the Racketeer
Influenced and Corrupt Organizations Act of 1970 codified at 18 U.S.C. § 1961,
*et. seq.* (RICO) as the Plaintiffs have been injured in their business or property by
the conduct of the Defendants, which constitutes a violation of 18 U.S.C. §
1962(c). The Plaintiffs are persons as defined in 18 U.S.C. § 1964(c).

1133.     Specifically, the Plaintiffs allege that they have suffered the following injuries:

          a.     They are or were owners of real property improved with cabins and the
current value of the real property is substantially less than what the
Plaintiffs paid to purchase the real property and the value of the real

property is less than the amount of the indebtedness currently owed by the
Plaintiffs.

b.   Each of the Plaintiffs entered into a lease agreement with Deer Path,
whereby Deer Path agreed to lease the real property in exchange for a
monthly payment to be made to the Plaintiffs which generally was enough
to pay the monthly installment due on the mortgage indebtedness and the
expenses associated with the real property.  Plaintiffs aver that Deer Path
has defaulted on its obligation under the lease and the Plaintiffs are not
receiving any lease payments.

c.   The Plaintiffs made payments under the terms of the notes and paid other
financial obligations.

d.   The Plaintiffs paid closing costs for the construction loans, appraisal fees,
closing costs for the permanent loans, and, in some cases, made down
payments for the purchase of the cabins.

1134.   The racketeering enterprise, within the meaning of 18 U.S.C. § 1961, is an
association in fact of individuals and legal entities that schemed to fraudulently
sell and finance investment properties to the Plaintiffs and others, all of whom
became victims of the scheme.  These various associates, as set forth hereinafter,
functioned and are presently functioning as a continuing unit.

1135.   The participants who make up the criminal enterprise are as follows: First
Tennessee;  J.W. Compton;  First Horizon Home Loans;  J. Mark Leho d/b/a
Farragut Mortgage;  New South Federal Savings Bank;  Deer Path Vacations,
L.P.;  Stetson and Associates of Tennessee;  Daniel Stetson;  Mark Stetson;

Charles M. Gordon, III; Dale Martin; Covenant Title & Escrow, LLC.

1136.     The Plaintiffs aver that each of the members of the enterprise participated in the
          operation and management of the enterprise and was actually involved in
          directing the affairs of the enterprise. The enterprise was an entity separate and
          apart from the pattern of activity in which each participant engaged. The
          enterprise had a distinct structure separate from the racketeering activities based
          on the essential functions of each participant in the enterprise. The scheme to
          defraud and actively conceal the problems with Deer Path required the
          participation of each member of the enterprise. The enterprise was at all times
          material hereto engaged in interstate or foreign commerce and the enterprise was
          distinct from each of the members of the enterprise. The Plaintiffs rely upon the
          general and specific facts stated hereinabove in support of its allegation
          concerning the existence of the enterprise. However, the following is a brief
          summary of the participation of each of the members:

          a.     First Tennessee provided construction loans to the Plaintiffs for which it
                 earned fees and interest. Through its agent, J.W. Compton, First
                 Tennessee participated in the sale of the real property to the Plaintiffs.
                 After realizing that Deer Path was not a financially viable project, First
                 Tennessee took actions to find a permanent lender, other than First
                 Horizon Home Loans, to take out its construction loans. First Tennessee
                 never disclosed to the cabin owners, who were their clients, that Deer Path
                 was no longer a financially viable project. In fact, First Tennessee took
                 affirmative actions to conceal the shaky financial situation of Deer Path.

In doing so, First Tennessee Bank acted in furtherance of the criminal conspiracy.

b.  First Horizon, through its agent, J.W. Compton, participated in the sale of the real property. First Horizon intended to make a permanent loan to each of the Plaintiffs after each cabin was constructed for which First Horizon would have earned fees and interest. After realizing that Deer Path was not a financially viable project, First Horizon refused to provide any more permanent loans to the cabin owners. First Horizon never disclosed to the cabin owners, who were their clients, that Deer Path was no longer a financially viable project. In fact, First Horizon took affirmative actions to conceal the shaky financial situation of Deer Path. In doing so, First Horizon acted in furtherance of the criminal enterprise.

c.  J.W. Compton participated in the sale of the real property and acted as the agent for First Tennessee, First Horizon, and Farragut Mortgage Group. J.W. Compton earned commissions based upon the construction loans and permanent loans which were provided by his employers. J.W. Compton was at all relevant times aware of and privy to the financial and structural problems with each of the three Deer Path developments and never took actions to inform the Plaintiffs, who trusted him to be honest about their investment in Deer Path. In doing so, J.W. Compton acted in furtherance of the criminal enterprise.

d.  J. Mark Leho d/b/a Farragut Mortgage provided permanent financing to many of the Plaintiffs for which he received fees and interest. Despite his

knowledge of the financial and structural problems with each of the three Deer Path developments, J. Mark Leho, acting through his agent, J.W. Compton, took actions to keep Deer Path financially afloat. He did so by purchasing one million dollars ($1,000,000.00) worth of unrecorded second mortgages for five hundred thousand dollars ($500,000.00), taking out First Tennessee's construction loans, providing permanent financing, and assigning refinanced loans to New South. J. Mark Leho had a duty to inform the Plaintiffs of the true financial situation at Deer Path and he breached this duty by failing to inform them that Deer Path was no longer a financially viable project. In doing so, J. Mark Leho acted in furtherance of the criminal enterprise.

e.   Deer Path and its affiliates, Daniel Stetson, Mark Stetson, Dale Martin, and Charles M. Gordon, III, participated in the sale of the real property to the Plaintiffs and constructed the cabins for the Plaintiffs. Deer Path and its affiliates persuaded the Plaintiffs to execute powers of attorney and never disclosed that the powers of attorney would later be used to execute second mortgages. They actively concealed the financial and structural problems with the Deer Path developments from the cabin owners. In doing so, Deer Path and its affiliates acted in furtherance of the criminal enterprise.

f.   New South through its correspondent broker, J. Mark Leho, provided permanent financing to many of the Plaintiffs and received assignments of the mortgages with knowledge of their inadequacies. By purchasing and

accepting assignments from J. Mark Leho, New South acted in furtherance
of the scheme to keep Deer Path financially afloat and it did all of this
without disclosing its actions to the Plaintiffs. Also, by altering
applications and intentionally misclassifying properties, New South
employees acted in furtherance of the criminal enterprise.

g.  Covenant Title & Escrow acted as title insurer at the closing of the
permanent loans despite actual knowledge of the title and utility problems
at the Deer Path Developments. Covenant Title had a duty to disclose the
title and utility problems to the Plaintiffs and it failed to do so in violation
of its duty to investigate and report exceptions to the Plaintiffs' title. In
doing so, Covenant Title acted in furtherance of the criminal enterprise.

1137.  The common or shared purpose of the enterprise was to sell real property,
construct cabins on the real property, provide financing for the purchase of the
real property and construction of the cabins, and provide long-term financing
after construction of the cabins was complete.

1137a.  As set forth above, the enterprise engaged in a scheme to fraudulently sell to the
Plaintiffs and finance for the Plaintiffs vacation homes located in the Deer Path
developments. The Defendants utilized the U.S. mail and committed wire fraud
to further their scheme to defraud the Plaintiffs. The funds derived from such
unlawful activity were ultimately deposited into First Tennessee Bank and were
subsequently used by Deer Path for development of the resort and to make it
appear that Deer Path was solvent and able to make the lease payments for which
it was obligated.

1138.    Each of the members of the enterprise participated in the conduct of such enterprise affairs through a pattern of racketeering activity. As alleged above, each of the Plaintiffs was injured as a direct and proximate result of the participation of each of the members in the affairs of the enterprise which operated through a pattern of racketeering activity.

1139.    The Plaintiffs aver that the actions of the Defendants constitute racketeering activity. The predicate acts of the racketeering activity were directly related to the land development plan of Deer Path. All of the predicate acts of the racketeering activity are part of the nexus of affairs and functions of the racketeering enterprise. All of the predicate acts of the racketeering activity have the same or similar purpose, results, participants, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events. The Defendants were enabled to commit the predicate offenses by virtue of their positions in the enterprise or involvement in or control over the affairs of the enterprise. All of the predicate acts of racketeering activity occurred after the effective date of 18 U.S.C. § 1961, et. seq.. The predicate acts of racketeering activity began in 1997 and continued through at least August of 2002.

1140.    As stated specifically for each Plaintiff, the Plaintiffs were sent two or more mailings from members of the enterprise in furtherance of the enterprise. The Plaintiffs allege that the mailings constitute mail fraud pursuant to 18 U.S.C. § 1341. The Plaintiffs aver that the mailings were made in furtherance of the enterprise and with the specific intent to deceive or defraud the Plaintiffs and

others. As set forth above, the enterprise engaged in a scheme to fraudulently sell to the Plaintiffs and finance for the Plaintiffs vacation homes located in the Deer Path projects. The utilization by the Defendants of the U.S. mail was in furtherance of the Defendants' scheme to defraud the Plaintiffs.

1141.    The Plaintiffs allege that in furtherance of the Defendants' scheme to defraud the Plaintiffs, the Defendants utilized the wires in violation of 18 U.S.C. § 1343. The Plaintiffs aver that the wire communications were made for the purpose of executing the Defendants' scheme to defraud the Plaintiffs and others. The Plaintiffs rely upon the specific facts stated above for each Plaintiff.

1142.    The Plaintiffs allege that Deer Path, by and through its agents, obtained money which was derived from unlawful activity. Specifically, Deer Path unlawfully derived money from the RAI investment scheme as set forth hereinabove. The funds derived from such unlawful activity were ultimately deposited into First Tennessee Bank and were subsequently used by Deer Path for development of the resort and to make it appear that Deer Path was solvent and able to make the lease payments for which it was obligated. The Plaintiffs aver that First Tennessee and First Horizon, by and through their agent, J.W. Compton, knew of the source of such funds and that the unlawfully obtained funds were used for Deer Path. The Plaintiffs aver that the scheme to use illegally obtained funds for Deer Path involved approximately fifty (50) investors who invested more than four million dollars ($4,000,000.00) over a period of time beginning in 1997 and ending in 2002. The Plaintiffs allege that such activity constitutes a violation of 18 U.S.C. § 1956 and 1957.

Respectfully submitted this the _____15_____ day of _____July_____ ,2004.

BRENT R. WATSON, BPR # 10154
Attorney for the Plaintiffs
BUNSTINE, WATSON & McELROY
800 S. Gay Street, Suite 2001
Knoxville, Tennessee, 37929
(865) 523-3022

## PROOF OF SERVICE

Pursuant to Rule 5(b), Federal Rules of Civil Procedure, I hereby certify that a copy of the foregoing was served upon the attorneys for the Defendants on this ___ day of ___, 2003 by placing the same in the U.S. mail, postage prepaid, addressed to the following:

1. First Tennessee Bank National Association and First Horizon Home Loan Corp. d/b/a First Tennessee Home Loans through their attorney, John C. Speer of Bass, Berry & Simms, 100 Peabody Place, Suite 950, Memphis, TN 38103.

2. First Tennessee Bank National Association and First Horizon Home Loan Corp. d/b/a First Tennessee Home Loans through their attorney, Melinda Meador of Bass, Berry & Simms, 900 S. Gay Street, Suite 1700, Knoxville, TN 37902.

3. J.W. Compton through his attorney David M. Eldridge, Eldridge & Blakney, 1404 Riverview Tower, 900 S. Gay Street, Knoxville, TN 37902.

4. Dale Martin through his attorney Carl R. Ogle, Jr. at 669 E. Broadway Blvd., P.O. Box 129, Jefferson City, TN 37760-0129.

5. Mark Stetson at his residence, 1223 Stetson Lane, Sevierville, TN, 37876.

6. Charles M. Gordon, III at his last known residence at 1236 Stetson Lane, Sevierville, TN 37876.

7. J. Mark Leho d/b/a Farragut Mortgage Group through his attorney Andrew S. Roskind at McKellar Roskind, Franklin Square, 9724 Kingston Pike, Suite 208, Knoxville, TN 37922.

8. First American Title Company through its attorneys Clifford D. Pierce Jr. and Scott B. Ostrow of Wyatt, Tarrant, & Combs, LLP at 1715 Aaron Brenner Drive, Suite 800, Memphis, Tennessee 38120.

9. Covenant Title/Covenant Title & Escrow LLC through its attorney Richard K. Evans, at 1000 Waterford Place, Suite 200, P.O. Box 777, Kingston, TN 37763.

10. Stewart Title Guaranty Company through its attorney Lewis Howard at Howard & Howard, P.C. 4800 Old Kingston Pike, Suite 220 Knoxville, TN 37919.

11. Regions Bank as successor corporation of Lincoln County Bank, Inc. through its through its attorney Sam McAllester III/ Keith Dennen at Bone, McAllester, Norton, PLC, 511 Union Street, Suite 1600, Nashville, TN 37219.

12. New South Federal Savings Bank through its attorney Shelly Wilson at Robertson and Overbey, 530 South Gay Street, Suite 802 Knoxville, Tennessee 37929.

13. Homecoming Financial Network, Inc. through its attorney Larry W. Johnson of Morris, Schneider & Prior, 3300 N.E. Expressway, Building 8, Atlanta, GA 30341.

14. Countrywide Home Loans of Tennessee, Inc. through its attorney Randal S. Mashburn of Baker, Donelson, Bearman, & Caldwell, P.C., 211 Commerce St., Suite 1000, Nashville, TN 37201.

15. Union Planters Bank and SouthStar Funding, LLC through its attorney Charles W. Cook, III Stokes, Bartholomew, Evans & Petree, 424 Church Street, Nashville, TN 37219.

16. ABN-AMRO Mortgage Group, Inc. through its attorney Diane M. Kehl of Vedder, Price, Kaufman & Kammholz, P.C., 222 North LaSalle Street, Chicago, IL 60601.

17. ABN-AMRO Mortgage Group, Inc. through its attorney Steve Daves of O'Neil, Parker & Williamson, 416 Cumberland Avenue, S.W., P.O. Box 217, Knoxville, TN 37901-0217.

18. National City Mortgage through its attorney Larry Johnson of Morris, Schneider & Prior, LLC at 3300 N.E. Expressway, Suite 8-B, Atlanta, GA 30341.

19. Milstead's Appraisal Service and Wes Milstead and Michael Snyder through attorney Robert H. Green of Kennerly, Montgomery, & Finley, P.C. at P.O. Box 442, Knoxville, Tennessee 37901-7311.

20. Cole Appraisal Group and Charles Cole through attorney Reggie E. Keaton of Frantz, McConnell & Seymour, LLP at 550 Main Avenue, Suite 500, P.O. Box 39, Knoxville, TN 37901-0039.

21. Jim Ellison and Ellison Surveying, LLC through its attorney Douglas E. Taylor, 124 Court Avenue, Sevierville, TN 37862.

22. Wells Fargo through attorneys Andrew L. Colocotronis and Robert Chapski of Baker, Donelson, Bearman, Caldwell & Berkowitz, 2200 Riverview Tower, 900 S. Gay Street, Suite 2200, Knoxville, TN 37901.

23.     SouthStar Funding, LLC through attorney Charles W. Cook, III, Stokes, Bartholomew, Evans & Petree, 424 Church Street, Nashville, TN 37219.

24.     Guaranty Residential Lending, Inc., through its registered agent for service of process CT Corporation System, 530 Gay Street, Knoxville, Tennessee 37902.

25.     Churchill Mortgage Corporation, through its registered agent for service of process Charles B. Reasor, Jr. at 3102 West End Avenue, Suite 1150, Nashville, Tennessee 37203.

BRENT R. WATSON, BPR # 10154
Attorney for Plaintiffs